## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**JEROME D. FRUIT,**

        **Plaintiff,**

**v.**                                                      **Case No. 2:14-cv-07643**

**CAROLYN W. COLVIN,**
**Acting Commissioner of**
**Social Security,**

        **Defendant.**

### <u>MEMORANDUM OPINION</u>

        This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 13 & 14). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 4 & 5). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court **FINDS** that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.    <u>Procedural History</u>

        On June 20, 2011 and November 29, 2012, Plaintiff Jerome D. Fruit ("Claimant") filed applications for DIB and SSI, respectively. (Tr. at 146, 159). Claimant alleged a

disability onset date of June 15, 2007, (*id.*), due to "depression, PTSD [posttraumatic stress disorder], [and] arthritis in hands." (Tr. at 172). The Social Security Administration ("SSA") denied Claimant's DIB application initially and upon reconsideration. (Tr. at 91, 102). Claimant requested an administrative hearing on February 13, 2012, (Tr. at 105-06), before filing his SSI application in November 2012, (Tr. at 159). Once Claimant filed his SSI application, the application was escalated to the administrative hearing level, (Tr. at 70-71), and a hearing was held on both applications on April 2, 2013 before the Honorable Jason Yoder, Administrative Law Judge ("ALJ"). (Tr. at 28-69). By written decision dated April 18, 2013, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-23). The ALJ's decision became the final decision of the Commissioner on December 11, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On February 5, 2014, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer and a Transcript of the Proceedings on May 2, 2014. (ECF Nos. 11 & 12). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 13 & 14). Accordingly, this matter is ready for disposition.

## II.    **Claimant's Background**

Claimant was 53 years old at the time of his alleged onset of disability and 59 years old on the date of the ALJ's decision. (Tr. at 21, 23, 34). He has a college degree in social studies and physical education, and he communicates in English. (Tr. at 34-35, 171, 173). Claimant has prior work experience as a middle school and high school teacher and coach. (Tr. at 37, 173-74).

### III.    <u>Summary of ALJ's Findings</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of

past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is

4

not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through December 31, 2012. (Tr. at 13, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since June 15, 2007, the alleged disability onset date. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of "degenerative joint disease; lumbar strain, possible osteoarthritis; alcohol abuse, in remission; cocaine abuse, in remission; depressive disorder, not otherwise specified/major depression; [PTSD]; generalized anxiety disorder; and cognitive disorder, not otherwise specified." (Tr. at 14-15, Finding No. 3). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, failed to meet or medically equal any of the listed impairments. (Tr. at 15-16, Finding No. 4). Consequently, the ALJ found that Claimant had the RFC to:

> [P]erform medium work, as defined in 20 CFR 404.1567(c) and 416.967(c) except that he can occasionally climb, balance, stoop, kneel, crouch, and crawl; he can occasionally reach overhead with the right upper extremity.

5

He can frequently, but not constantly, grasp and perform fine finger manipulation. He must avoid concentrated exposure to temperature extremes, vibration, and workplace hazards such as moving machinery and unprotected heights. Additionally, the claimant is able to understand, remember, and carry out no more than simple, routine, repetitive tasks that require the use of little independent judgment or decision-making; he can tolerate no more than occasional contact with the general public.

(Tr. at 17-20, Finding No. 5). Based upon the RFC assessment, the ALJ determined at the fourth step that Claimant was unable to perform any past relevant work. (Tr. at 21, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine if he would be able to engage in substantial gainful activity. (Tr. at 21-22, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1954, and was 53 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date, but subsequently changed age category to advanced age; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because using the Medical-Vocational Rules as a framework supported a finding that Claimant was not disabled whether or not Claimant had transferable job skills. (Tr. at 21, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, (Tr. at 21-22, Finding No. 10), including work in medium, unskilled jobs such as laundry worker, cleaner, and sorter. (Tr. at 21-22). Therefore, the ALJ concluded that Claimant had not been disabled as defined in the Social Security Act from June 15, 2007 through the date of the ALJ's decision, and thus, he was not entitled to benefits. (Tr. at 22, Finding No. 11).

**IV.** **Claimant's Challenges to the Commissioner's Decision**

Claimant raises a single challenge to the Commissioner's decision. He argues that the ALJ failed to assign appropriate weight to the opinions of Mohammad K. Hasan, M.D., who was Claimant's treating psychiatrist.[1] (ECF No. 13 at 18-21). Specifically, Claimant highlights Dr. Hasan's opinions that Claimant has "poor" ability in the areas of dealing with the public, interacting with supervisors, dealing with work stressors, understanding complex instructions, remembering complex instructions, carrying out complex instructions, maintaining attention and concentration, behaving in an emotionally stable manner, and demonstrating reliability. (*Id.* at 8). Claimant contends that the ALJ failed to explain how he applied the various factors used in assessing medical opinions when weighing Dr. Hasan's opinions. (*Id.* at 19). Claimant alleges that the Court can only speculate as to the ALJ's reasons for assigning "very little weight" to Dr. Hasan's opinions because the ALJ neglected to cite specific treatment records that contradicted Dr. Hasan's opinions. (*Id.* at 21). In addition, Claimant asserts that, once the ALJ rejected both Dr. Hasan's opinions as to Claimant's mental limitations and the opinions of the state agency medical consultants, the ALJ was left with no medical expert opinions from which he could determine Claimant's mental RFC. (*Id.* at 18).

In response, the Commissioner contends that her decision should be affirmed for two reasons. First, the ALJ's RFC finding is supported by substantial evidence. (ECF No. 14 at 12). More particularly, the Commissioner maintains that the treatment records demonstrate that Claimant's mental health symptoms are stable on medication. (*Id.* at 13). The Commissioner also cites the consultative examination findings of Sunny S. Bell,

---

[1] Claimant also treated with a doctor by the name of Surayia T. Hasan for physical health issues. For the sake of clarity, Mohammad K. Hasan will be referred to as "Dr. Hasan" and Surayia T. Hasan will be referred to as "Dr. Surayia Hasan."

M.A., in support of the ALJ's RFC finding. (*Id.* at 13-14). Second, the ALJ correctly found that Dr. Hasan's treatment notes did not support his opinions as to the severity of Claimant's mental limitations. (*Id.* at 15). The Commissioner summarizes a number of Dr. Hasan's treatment records wherein he recorded that Claimant's mental health condition was stable on medication. (*Id.* at 15-16). Moreover, the Commissioner maintains that Claimant's activities of daily living and Ms. Bell's evaluation findings contradict Dr. Hasan's opinions. (*Id.* at 17). Finally, the Commissioner argues that Dr. Hasan provided no explanation in support of his opinions on the medical assessment form that he completed. (*Id.* at 18).

## V.     Relevant Medical History

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issue in dispute.

### A. Treatment Records

On June 26, 2007, Claimant visited Mohammad K. Hasan, M.D., for emotional behavioral problems, depression, and anxiety. (Tr. at 539). Dr. Hasan noted that Claimant was doing fairly well, and his depression and anxiety were under much better control. (*Id.*) Claimant reported that he was stable with his current medications and had not experienced any worsening of his symptoms. (*Id.*) Claimant informed Dr. Hasan that he was sleeping and eating well, and had no suicidal or homicidal thoughts, hallucinations, or delusions. (*Id.*) Dr. Hasan observed that Claimant was cooperative and oriented to time, place, and person. (*Id.*) Dr. Hasan further indicated that Claimant maintained eye contact and his speech rate and volume were both normal. (*Id.*) Dr. Hasan recorded that Claimant's mood was stable and his affect was euthymic. (*Id.*)

Claimant's thoughts were logical and his insight judgment was fair. (*Id.*) Dr. Hasan diagnosed Claimant with major depression, recurrent moderate to moderate-severe in nature; and adjustment disorder with anxious and depressed mood secondary to physical illness and situational factors. (*Id.*) Dr. Hasan recommended that Claimant continue his current medications as he was stable with treatment at that time. (*Id.*)

On June 29, 2007, Claimant attended a psychological evaluation with Michael L. McDaniel, M.A., Licensed Psychologist, after being referred to Mr. McDaniel by Dr. Hasan. (Tr. at 540-51). Mr. McDaniel noted that Claimant had initiated treatment with Dr. Hasan for anxiety and depression due to recent stressors in his life and that Claimant had no prior history of psychiatric treatment. (Tr. at 540). Claimant informed Mr. McDaniel that he was single and had eight adult children as well as seven or eight grandchildren. (*Id.*) Claimant stated that he had a bachelor's degree plus fifteen hours "in Education."(*Id.*) He also indicated that he was employed as a teacher for almost thirty years, but lost his job after he was charged with and pled guilty to transporting drugs. (*Id.*) At the time of the evaluation, Claimant was awaiting sentencing. (*Id.*) Claimant stated that he was an occasional user of cocaine in the past and an occasional drinker. (*Id.*) Upon mental status examination, Mr. McDaniel observed that Claimant was pleasant and cooperative, but his mood was mildly anxious. (*Id.*) Claimant's speech was clear, relevant, and logically connected. (*Id.*) Mr. McDaniel recorded that Claimant was oriented and his attention and concentration processes were adequate. (*Id.*) Claimant's memory was also observed to be reasonably intact as were his abstract verbal reasoning abilities. (*Id.*) Mr. McDaniel noted that Claimant's judgment and insight appeared adequate, and Mr. McDaniel did not observe any evidence of active psychotic features. (*Id.*) Claimant denied suicidal and homicidal ideation. (*Id.*) Mr. McDaniel

administered the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") and observed that Claimant's profile resulted in clinically significant elevations on the depression, psychopathic deviate, and psychasthenia subscales. (*Id.*) Based on his evaluation of Claimant, Mr. McDaniel recommended that Claimant continue participating in outpatient psychopharmacological intervention designed to reduce the frequency of his anxiety and depressive features. (Tr. at 541). Mr. McDaniel also raised the possibility of psychotherapeutic intervention to assist in lessening the frequency and severity of Claimant's symptoms. (*Id.*)

Claimant returned to Dr. Hasan on July 6, 2007. (Tr. at 538). Dr. Hasan indicated that Claimant was doing fair and that his depression and anxiety were under much better control. (*Id.*) Dr. Hasan recorded that Claimant stated he was doing well and stable with his current medications. (*Id.*) Claimant also reported that he was sleeping and eating well, and he denied any suicidal or homicidal thoughts, hallucinations, and delusions. (*Id.*) Dr. Hasan observed that Claimant was cooperative with a stable mood and euthymic affect. (*Id.*) He recorded that Claimant maintained eye contact and that Claimant's speech was normal in rate and volume. (*Id.*) Dr. Hasan further indicated that Claimant's thoughts were logical with no indication of psychosis and his insight judgment was fair. (*Id.*) Claimant's diagnoses remained the same as did his treatment plan. (*Id.*) Dr. Hasan recommended that Claimant attend counseling. (*Id.*)

On August 3, 2007, Claimant again visited Dr. Hasan. (Tr. at 537). Claimant reported that he was doing fair most of the time. (*Id.*) He also stated that he was doing well and stable with his current medications. (*Id.*) Claimant further indicated that his symptoms had not worsened and that he was sleeping and eating well. (*Id.*) Claimant denied suicidal or homicidal ideation, hallucinations, and delusions. (*Id.*) Dr. Hasan

observed that Claimant's mood was stable, his affect was euthymic, his thoughts were logical, and his insight judgment was fair. (*Id.*) Claimant's diagnoses remained the same, and he was prescribed Serax and Lexapro. (*Id.*) Dr. Hasan again stressed the importance of counseling. (*Id.*)

Claimant next visited Dr. Hasan on August 31, 2007. (Tr. at 536). Dr. Hasan recorded that Claimant was doing well and was stable with his current medications. (*Id.*) Claimant indicated that his symptoms had not worsened and that he was sleeping and eating well. (*Id.*) Claimant denied suicidal or homicidal ideation, hallucinations, and delusions. (*Id.*) Dr. Hasan observed that Claimant was apprehensive, but his mood was stable and his affect was euthymic. (*Id.*) He further noted that Claimant's thoughts were logical and his insight judgment was fair. (*Id.*) Claimant's diagnoses and medications remained the same. (*Id.*) Dr. Hasan recorded that Claimant was to continue counseling with Mike Johnson. (*Id.*)

On October 26, 2007, Claimant reported to Dr. Hasan that he was having "a hard time," although he doing well and was stable on medications. (Tr. at 535). Of course, he still had "a lot of legal problems." (*Id.*) Claimant nonetheless confirmed that his symptoms had not worsened, and he was sleeping and eating well. (*Id.*) Claimant denied suicidal or homicidal ideation, hallucinations, and delusions. (*Id.*) Dr. Hasan recorded that Claimant's mood was stable and his affect was euthymic. (*Id.*) Claimant's thoughts were logical and his insight judgment was fair. (*Id.*) Dr. Hasan opined that Claimant continued to do "fair." (*Id.*) Claimant's diagnoses remained unchanged, and Dr. Hasan prescribed Campral, Valium, and Lexapro. (*Id.*)

On November 30, 2007, Claimant informed Dr. Hasan that he was doing fair, and his mood was much more stable. (Tr. at 534). He continued to wait for word regarding

11

his prison sentence. Claimant was stable on his medications, and again confirmed that his symptoms had not worsened, and he was sleeping and eating well. (*Id.*) He denied any suicidal or homicidal thoughts, hallucinations, and delusions. (*Id.*) Dr. Hasan observed that Claimant's mood was stable and his affect was euthymic. (*Id.*) Dr. Hasan also recorded that Claimant's thoughts were logical and his insight judgment was fair. (*Id.*) Claimant's diagnoses remained the same as did his medications. (*Id.*)

After being sentenced to prison on December 13, 2007, Claimant was seen for an in-take evaluation at the Federal Correctional Institution in Ashland, Kentucky by Stephen D. Lemon, Chief Psychologist, on January 31, 2008.[2] (Tr. at 349). Claimant reported that he had a history of alcohol and cocaine abuse. (*Id.*) He also informed Dr. Lemon that he was abused and neglected as a child; consequently, Claimant had suffered from chronic anxiety and depression since childhood. (*Id.*) As for his current symptoms, Claimant stated that he experienced edginess, irritability, anxiety, restlessness, rumination, tension, crying, and poor sleep. (*Id.*) Claimant denied suicidal ideation or aggressive behavior. (Tr. at 349-50). Dr. Lemon determined that Claimant's

---

[2] Claimant was incarcerated from December 13, 2007 to February 11, 2011. (Tr. at 38). Addressing the interplay between felony convictions and DIB, 42 U.S.C. § 423(d)(6) provides:

> (A) Notwithstanding any other provision of this subchapter, any physical or mental impairment which arises in connection with the commission by an individual (after October 19, 1980) of an offense which constitutes a felony under applicable law and for which such individual is subsequently convicted, or which is aggravated in connection with such an offense (but only to the extent so aggravated), shall not be considered in determining whether an individual is under a disability.

> (B) Notwithstanding any other provision of this subchapter, any physical or mental impairment which arises in connection with an individual's confinement in a jail, prison, or other penal institution or correctional facility pursuant to such individual's conviction of an offense (committed after October 19, 1980) constituting a felony under applicable law, or which is aggravated in connection with such a confinement (but only to the extent so aggravated), shall not be considered in determining whether such individual is under a disability for purposes of benefits payable for any month during which such individual is so confined.

Furthermore, an individual is not entitled to receive DIB for the period of his or her incarceration that resulted from a felony conviction. 20 C.F.R. § 404.468(a).

psychological stability for custody was favorable. (Tr. at 349). Dr. Lemon also recorded that Claimant was screened for mental disabilities, but none were found. (Tr. at 350). He recommended that Claimant participate in a drug abuse program and start taking Prozac. (Tr. at 349-50).

On April 11, 2008, Dr. Lemon again examined Claimant. (Tr. at 347). Dr. Lemon observed that Claimant displayed appropriate hygiene, grooming, affect, energy level, and attention/concentration. (*Id.*) Claimant informed Dr. Lemon that he had experienced little benefit from taking Prozac. (*Id.*) Claimant reported that he had poor sleep and cried at times when thinking about his family issues. (*Id.*) Claimant also indicated that he felt irritable. (*Id.*) Dr. Lemon recommended that Claimant's Prozac dosage be increased. (*Id.*)

Claimant was next seen by Dr. Lemon on April 24, 2008. (Tr. at 345). Dr. Lemon observed that Claimant was fully oriented with good hygiene. (*Id.*) Dr. Lemon also recorded that Claimant was alert with a normal energy level and restricted affect. (*Id.*) Claimant reported that he was irritable, which he attributed to the increased Prozac dosage. (*Id.*) As such, Claimant voluntarily lowered his dosage back to 20 mg. (*Id.*) Claimant denied any suicidal ideation, and Dr. Lemon indicated that there was no evidence of mania/hypomania, psychosis, severe anxiety, and severe depression. (*Id.*)

On May 29, 2008, Claimant was seen by a physician's assistant at the prison. (Tr. at 341-43). Claimant reported that he had a history of anxiety, mind-racing, and nervousness. (Tr. at 341). Claimant also stated that he was having difficulty falling asleep. (*Id.*) He further indicated that Prozac did not relieve his anxiety and nervousness. (*Id.*) Claimant denied any thoughts of harming himself or others. (Tr. at 342). The physician's assistant noted that Claimant was alert, pleasant, and made good

13

eye contact, with no overt signs of anxiety or depression. (*Id.*) Claimant was diagnosed with anxiety disorder and assigned a Global Assessment of Functioning ("GAF") score of fifty-five.[3] (*Id.*) Claimant's Prozac dosage was increased. (Tr. at 343).

On October 27, 2008, Claimant was seen by Ben Daming, MLP. (Tr. at 260). Mr. Daming observed that Claimant's mood and affect were pleasant. (Tr. at 261). He also recorded that Claimant displayed no overt anxiety or depression. (*Id.*) Claimant denied any suicidal thoughts. (*Id.*) Mr. Daming assessed Claimant with depressive disorder, not elsewhere classified. (*Id.*) He recommended that Claimant continue taking Prozac. (*Id.*)

On December 8, 2008, Claimant again treated with Dr. Lemon. (Tr. at 314). Claimant reported that he had thoughts of harming people who got on his nerves and that he was irritable. (*Id.*) Claimant also stated that he had experienced insomnia since he began his incarceration and that Prozac had not helped. (*Id.*) Dr. Lemon observed that Claimant's affect was bright, his hygiene was good, and his energy level was normal. (*Id.*) Dr. Lemon recorded that he would "ask medical" to consider changing Claimant's Prozac prescription to Celexa and to add Trazodone as well. (*Id.*)

On December 29, 2008, Claimant was examined by Brian Baier, RN. (Tr. at 254). Claimant denied any suicidal thoughts. (*Id.*) Nurse Baier recorded that Claimant's mood and affect were pleasant. (Tr. at 255). He also noted that Claimant displayed no overt anxiety or depression. (*Id.*) Nurse Baier further indicated that Claimant had good eye

---

[3] The Global Assessment of Functioning ("GAF") Scale is a 100–point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 32 (4th ed. 2002) ("DSM–IV"). On the GAF scale, a higher score correlates with a less severe impairment. The GAF scale was abandoned as a measurement tool in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM–5"), in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM–5 at 16. A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM–IV at 34.

contact and his speech was spontaneous, clear, and organized. (*Id.*) He recommended that Claimant begin taking Trazodone. (Tr. at 256).

Claimant next treated with Nurse Baier on January 12, 2009. (Tr. at 251). Claimant denied any suicidal thoughts and stated that Trazodone seemed to be helping his symptoms. (*Id.*) Nurse Baier observed that Claimant's mood and affect were pleasant, and he displayed no overt anxiety or depression. (Tr. at 252). He also noted that Claimant had good eye contact and his speech was spontaneous, clear, and organized. (*Id.*) Nurse Baier recorded that Claimant's depressive disorder progress had reached the "treatment goal." (*Id.*) He assigned a GAF score of 71-100, (*id.*), which indicates, at worst, "some mild symptoms ... OR some difficulty in social, occupational, or school functioning." DSM-IV at 34. Nurse Baier recommended that Claimant continue his medication. (Tr. at 252).

On March 25, 2009, Claimant was examined by Kenneth Gomez, M.D. (Tr. at 243). Claimant informed Dr. Gomez that he felt good and had no complaints. (Tr. at 451). He also stated that he was not depressed, anxious, or suicidal. (*Id.*) Dr. Gomez observed that Claimant's affect was pleasant and he was cooperative. (Tr. at 243). He also noted that Claimant's mood and thought process were appropriate. (*Id.*) Dr. Gomez did not notice any sadness, anxiety, or worry. (*Id.*) He indicated that Claimant denied any delusions, hallucinations, and suicidal and homicidal ideation. (*Id.*) Dr. Gomez recommended that Claimant continue taking Prozac 20 mg and Trazodone. (Tr. at 244).

On May 7, 2009, Claimant underwent a health screen performed by Bernard Shaffer, RN. (Tr. at 265). Nurse Shaffer recorded that Claimant was cooperative and his mood was appropriate. (Tr. at 266). Nurse Shaffer also observed that Claimant's thought process was goal direct and his thought content was normal. (*Id.*) Claimant denied any

suicidal ideation. (*Id.*)

On May 12, 2009, Claimant was examined by Michael Waters, M.D. (Tr. at 447). Claimant reported that his appetite and energy level were good, and he was sleeping well. (*Id.*) He denied any suicidal ideation. (*Id.*) Dr. Waters recorded that Claimant's affect was angry, but his mood was content. (Tr. at 448). Dr. Waters further indicated that Claimant's thought process was logical and his thought content was goal-directed. (*Id.*) Dr. Waters also noted that Claimant's perceptions and abstract thinking were normal. (*Id.*) He recommended that Claimant continue taking Prozac and Trazodone. (Tr. at 449).

On November 16, 2009, Claimant visited Jawad Ahmed, MLP. (Tr. at 403). Claimant informed Mr. Ahmed that he was doing "fine" and sleeping well. (*Id.*) He also reported that he had a good energy level and denied any suicidal thoughts. (*Id.*) Mr. Ahmed recorded that Claimant's affect and mood were normal. (Tr. at 404). Claimant was not observed to be anxious. (*Id.*) Mr. Ahmed noted that Claimant's thought process, perceptions, attention, and orientation were all normal. (*Id.*) He recommended that Claimant continue on Prozac and Trazodone. (Tr. at 405).

On May 19, 2010, Mr. Ahmed again examined Claimant. (Tr. at 393). Claimant informed Mr. Ahmed that he was feeling better and adjusting well. (*Id.*) Claimant denied any suicidal thoughts. (*Id.*) Mr. Ahmed observed that Claimant's affect and mood were normal and appropriate. (Tr. at 394). He also indicated that Claimant's thought process, thought content, perceptions, orientation, and attention were normal. (*Id.*) Claimant was not observed to be anxious. (*Id.*) Mr. Ahmed recommended that Claimant continue to take Prozac and Trazodone. (Tr. at 395).

16

On November 19, 2010, Claimant was seen by Dr. Waters and Mr. Ahmed. (Tr. at 358, 360). Claimant reported that he was feeling well and had not experienced any suicidal thoughts. (*Id.*) Claimant stated that he was leaving in a few months to go to a halfway house. (Tr. at 360). Mr. Ahmed recorded that Claimant's mood and affect were normal and appropriate. (Tr. at 361). He further observed that Claimant's thought process, thought content, perceptions, orientation, attention, and recent memory were normal. (*Id.*) Mr. Ahmed did not observe signs of anxiety. (*Id.*) He instructed Claimant to continue on Prozac and Trazodone. (Tr. at 362).

On May 13, 2011, after being released from prison, Claimant visited West Virginia Health Right Clinic and treated with Vicki Spurlock, FNP, BC. (Tr. at 455). Claimant stated that he made the appointment to establish care there as a new patient. (*Id.*) Claimant informed Ms. Spurlock that he was treating with Dr. Nease at Prestera Centers for Mental Health for anxiety and depression. (*Id.*) Claimant indicated that Dr. Nease had prescribed Lexapro and Trazodone, and Claimant asserted that he felt better on Lexapro. (*Id.*) He also stated that he felt his anxiety and depression were stable. (*Id.*) Claimant denied any homicidal or suicidal ideation, but admitted that he felt angry and hostile at times. (*Id.*) Ms. Spurlock instructed Claimant to continue treating with Dr. Nease for his anxiety and depression. (*Id.*)

Claimant returned to Dr. Hasan on October 3, 2011 with complaints of depression and anxiety. (Tr. at 542). Claimant informed Dr. Hasan that he felt he needed to get back into treatment. (*Id.*) He denied any suicidal or homicidal ideations. (*Id.*) Claimant stated that he did not need help in caring for his personal hygiene or performing chores. (*Id.*) Dr. Hasan noted that Claimant had a hard time coping, difficulty sleeping, nervousness, and anxiousness. (*Id.*) He also recorded that Claimant

17

had been helping his mother, who suffered from Alzheimer's disease. (*Id.*) Dr. Hasan further indicated that Lexapro, Abilify, and Trazodone had helped Claimant's symptoms in the past. (*Id.*) Upon mental status examination, Dr. Hasan observed that Claimant was cooperative and his speech was clear, audible, and rational. (*Id.*) Claimant was oriented and his cognition was intact. (*Id.*) Dr. Hasan recorded that Claimant's affect was somewhat dysphoric and his insight, judgment, and problem solving were fair. (*Id.*) Claimant's thought processes were observed to be normal, and his abstract thinking was appropriate. (*Id.*) Dr. Hasan opined that Claimant appeared to be of average to above-average intelligence. (*Id.*) He found no clinical evidence of organicity, psychosis, or thought disorder. (*Id.*) Claimant was diagnosed with major depressive disorder, recurrent, moderate to moderate-severe in nature; and generalized anxiety disorder. (Tr. at 542-43). Dr. Hasan assigned a GAF score of forty-five to fifty,[4] and recommended that Claimant take Valium and Sinequan along with Viibryd. (Tr. at 543).

On December 27, 2011, Claimant treated with Debra R. Mooney, whose credentials are not listed. (Tr. at 544). Claimant stated that he was sleeping and eating well. (*Id.*) He denied experiencing any hallucinations, delusions, and suicidal or homicidal ideations. (*Id.*) Ms. Mooney noted that Claimant's symptoms were stable. (*Id.*) She also observed that Claimant was cooperative with a broad affect and euthymic mood. (*Id.*) She recorded that Claimant's thoughts were logical, his memory was intact, and his insight and judgment were good. (*Id.*) Claimant was assessed with major depressive disorder, recurrent, in partial remission. (*Id.*) Ms. Mooney opined that Claimant did not warrant inpatient psychiatric admission. (*Id.*) She recommended that

---

[4] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM–IV at 34.

Claimant continue his current medications, including Sinequan, Valium, and Viibryd. (*Id.*)

On March 20, 2012, Claimant followed up with Dr. Hasan and complained of irritability and mood swings. (Tr. at 567). Claimant informed Dr. Hasan that he was sleeping and eating well. (*Id.*) He denied experiencing any hallucinations, delusions, and suicidal or homicidal ideations. (*Id.*) Dr. Hasan noted that Claimant was cooperative with a broad affect and euthymic mood. (*Id.*) He further observed that Claimant's thoughts were logical, his memory was intact, and his insight and judgment were good. (*Id.*) Dr. Hasan diagnosed Claimant with major depressive disorder, recurrent, in partial remission; and generalized anxiety disorder. (*Id.*) Dr. Hasan opined that Claimant did not warrant inpatient psychiatric admission. (*Id.*) Claimant was instructed to continue taking Viibryd, Sinequan, and Valium along with an increased dose of Lamictal. (*Id.*)

Claimant returned to Dr. Hasan on April 16, 2012, reporting that his symptoms were stable and that Viibryd was helping his symptoms. (Tr. at 568). Claimant informed Dr. Hasan that he was eating and sleeping well. (*Id.*) He again denied experiencing any hallucinations, delusions, and suicidal or homicidal ideations. (*Id.*) Dr. Hasan recorded that Claimant was cooperative with a broad affect and euthymic mood. (*Id.*) Claimant's thoughts were logical, and his memory was intact. (*Id.*) Dr. Hasan observed that Claimant's insight and judgment were good. (*Id.*) Claimant's diagnoses remained the same, and Dr. Hasan instructed Claimant to continue taking his medications. (*Id.*)

On June 6, 2012, Claimant visited Michael A. Johnson, Licensed Independent Clinical Social Worker. (Tr. at 569). Claimant stated that he was depressed and that he was busy caring for his mother. (*Id.*) Claimant also reported experiencing poor concentration and fleeting suicidal ideation with no intent or plan. (*Id.*) Claimant

relayed that he had been told he was worthless for his entire life and that he had problems adjusting to losing his job and being out of prison. (*Id.*) Mr. Johnson observed that Claimant's mood was depressed and his affect was bland. (*Id.*) He noted that Claimant's insight and judgment were fair. (*Id.*)

Claimant visited Dr. Hasan four additional times in 2012 on June 11, August 6, October 1, and November 26. (Tr. at 570-73). At each appointment, Claimant reported that his symptoms were stable and that he was eating and sleeping well. (*Id.*) He also denied experiencing any hallucinations, delusions, and suicidal or homicidal ideations at all four appointments. (*Id.*) Dr. Hasan's "objective" observations were identical at each visit. (*Id.*) He indicated that Claimant was cooperative with a broad affect and euthymic mood. (*Id.*) He noted that Claimant's thoughts were logical and his memory was intact. (*Id.*) Dr. Hasan also recorded that Claimant's insight and judgment were good. (*Id.*) Claimant's diagnoses remained the same over the four visits, and he was repeatedly instructed to continue taking his medications. (*Id.*) Dr. Hasan also opined at each appointment that Claimant's condition did not warrant inpatient psychiatric admission. (*Id.*)

On January 14, 2013, Claimant again treated with Dr. Hasan. (Tr. at 617). Claimant reported that he was doing fair, but reported feeling nervous, anxious, and agitated. (*Id.*) He stated that his girlfriend had falsely accused him of domestic violence, and he was having a hard time coping with that. (*Id.*) Still, Claimant informed Dr. Hasan that he was eating and sleeping well. (*Id.*) He also denied experiencing any hallucinations, delusions, and suicidal or homicidal ideations. (*Id.*) Dr. Hasan indicated that Claimant was pleasant and cooperative, but "a little guarded," with a broad affect and euthymic mood. (*Id.*) Dr. Hasan further noted that Claimant's thoughts were

logical, his memory was intact, and his insight and judgment were fair. (*Id.*) Dr. Hasan diagnosed Claimant with major depressive disorder and generalized anxiety disorder. (*Id.*) Dr. Hasan opined that Claimant was clinically stable and advised Claimant to continue taking Lamictal, Viibryd, Valium, and Sinequan. (*Id.*)

Claimant next visited Dr. Hasan on January 23, 2013. (Tr. at 574). Claimant reported that he had misplaced his Valium prescription. (*Id.*) He further stated that he was eating and sleeping well. (*Id.*) He denied experiencing any hallucinations, delusions, and suicidal or homicidal ideations. (*Id.*) Dr. Hasan observed that Claimant was cooperative with an anxious mood and restricted affect. (*Id.*) Dr. Hasan recorded that Claimant's thoughts were logical, his memory was intact, and his insight and judgment were good. (*Id.*) Claimant's diagnoses remained the same, and he was given a replacement prescription for Valium 10 mg. (*Id.*)

On February 5, 2013, Claimant treated with Surayia T. Hasan, M.D. (Tr. at 598). Claimant reported that he was not doing well and that his depression had worsened, which caused him to stay home and eat. (Tr. at 599). He stated that he had gained a lot of weight. (*Id.*) Dr. Surayia Hasan observed that Claimant was alert and oriented. (Tr. at 600). She also recorded that Claimant seemed stable and did not seem anxious or depressed. (*Id.*) She further noted that Claimant's judgment and memory appeared to be normal. (*Id.*) Claimant was instructed to go on a low cholesterol diet, to start walking daily, and to continue taking his medications. (*Id.*)

### B. Mental Evaluations and Opinions

#### 1. Sunny S. Bell, M.A.

On September 2, 2011, Claimant was evaluated by Sunny S. Bell, M.A., Licensed Psychologist, for the West Virginia Disability Determination Service. (Tr. at 486-92).

Ms. Bell noted that Claimant was driven to the evaluation by a friend. He explained that he had recently been released from prison and had not had the energy to renew his driver's license. Claimant's personal hygiene appeared adequate and he was pleasant and cooperative. (Tr. at 486). Claimant advised Ms. Bell that he currently lived with his mother in a home that she owned. (Tr. at 487). When asked why he was applying for disability benefits, Claimant stated that he suffered from arthritis in his hands, high blood pressure, high cholesterol, acid reflux, and anemia. (Tr. at 486-87). He indicated that he had suffered from depression and feelings of worthlessness since he was a child. (Tr. at 487) He also reported that he felt paranoid due to how his grandfather treated him. (*Id.*) As for Claimant's symptoms, he reported experiencing crying episodes, decreased energy, and sleep difficulties. (*Id.*) He also indicated that he felt irritable, anxious, fatigued, tense, hopeless, helpless, worthless, useless, apathetic, and withdrawn. (*Id.*) Claimant admitted experiencing suicidal thoughts, but denied making any plans or attempts. (*Id.*) He denied homicidal ideation, but stated that he had wanted to hurt people in the past. (*Id.*) When asked about hallucinations, Claimant responded that he could still hear his grandfather telling him that he is worthless. (*Id.*) He recounted that he was physically and psychologically abused by his grandfather as a child. (*Id.*) The abuse led Claimant to have recurrent dreams and persistent thoughts of the abuse. (*Id.*) He informed Ms. Bell that his nightmares woke him up at night, but that his medication improved his sleep. (Tr. at 488). He stated that his appetite was fair. (*Id.*) Claimant described his mood at the time of the evaluation as sad. (Tr. at 487). He indicated that he had additional problems with anxiety, concentration, decision-making, and memory. (Tr. at 487-88). Claimant stated that he had been prescribed medication for his symptoms, including Abilify, Lexapro, and Trazodone, which he believed helped.

(Tr. at 488). With regard to substance abuse, Claimant admitted that he had problems in the past with alcohol and cocaine. (*Id.*) He denied suffering from any symptoms of withdrawal after being incarcerated. (*Id.*) As to Claimant's educational history, he stated that he received good grades in high school and later obtained a bachelor's degree in education. (Tr. at 489). Claimant indicated that he had worked for the Fayette County Board of Education as a teacher and coach from 1977 to June 2007, when he quit his job. (*Id.*) He reported that he was reliable and related well with coworkers and supervisors. (*Id.*) He further indicated that he had never been fired from a job. (*Id.*)

Upon mental status examination, Ms. Bell observed that Claimant was cooperative and motivated. (*Id.*) She also recorded that Claimant interacted in a socially appropriate manner and spontaneously generated conversation, but did not exhibit a sense of humor. (*Id.*) Claimant's eye contact was good, and his speech was clear, goal-directed, and relevant. (*Id.*) He was oriented with a depressed mood and a restricted affect. (*Id.*) Ms. Bell noted that Claimant's thought process was goal-directed and relevant. (*Id.*) Claimant's thought content and judgment were normal. (*Id.*) Ms. Bell did not observe any perceptual problems, but acknowledged that Claimant had reported auditory hallucinations. (*Id.*) Ms. Bell recorded that Claimant admitted to vague suicidal thoughts without any attempts or plans. (Tr. at 490). She also noted that Claimant denied homicidal ideation. (*Id.*) Ms. Bell opined that Claimant's immediate, recent, and remote memory were all within normal limits and that Claimant's concentration was within normal limits as well. (*Id.*)

At the evaluation, Ms. Bell administered a series of psychological tests. First, Ms. Bell had Claimant complete the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"). Claimant scored 89 on verbal comprehension, 73 on perceptual reasoning,

23

111 on working memory, and 84 on processing speed. (*Id.*) Claimant earned a full scale IQ score of 84. (*Id.*) Ms. Bell opined that the results of the test were valid as Claimant was cooperative and appeared motivated. (*Id.*) She further opined that Claimant had functioned at a higher level in the past and that his current scores reflected a cognitive disorder. (*Id.*) Next, Ms. Bell administered the Neurobehavioral Cognitive Status Evaluation test ("COGNISTAT"). (Tr. at 491). Claimant scored in the average range on the orientation, attention, repetition, memory, and calculation subtests. (*Id.*) He scored in the mildly deficient range on the construction subtest. (*Id.*) He passed screening on the comprehension, naming, similarities, and judgment subtests. (*Id.*)

Ms. Bell diagnosed Claimant with depressive disorder, not otherwise specified; PTSD; generalized anxiety disorder; cognitive disorder, not otherwise specified; alcohol abuse, sustained for remission; and cocaine abuse, sustained for remission. (*Id.*) Ms. Bell explained that her diagnosis of depressive disorder was based on Claimant's depressed mood and restricted affect; his lack of sense of humor; his complaints of depression, crying episodes, decreased energy, sleep difficulties, irritability, decreased libido, vague suicidal thoughts, auditory hallucinations, being withdrawn, and apathy; and his feeling hopeless, helpless, worthless, and useless. (*Id.*) With regard to PTSD, Ms. Bell cited Claimant's recurrent dreams, persistent thoughts, and flashbacks related to the abuse that he experienced as a child. (*Id.*) Ms. Bell also relied on Claimant's "startle response" and feeling of estrangement from others. (*Id.*) In relation to her generalized anxiety diagnosis, Ms. Bell indicated that Claimant complained of problems with anxiety and concentration and that he was easily fatigued and irritable although he also felt restless and "keyed up." (*Id.*) As to the diagnosis of cognitive disorder, Ms. Bell observed that Claimant complained of difficulties with concentration, decision-making, and

memory. (Tr. at 492). Ms. Bell further opined that Claimant's test results were indicative of a cognitive disorder. (*Id.*)

With regard to daily activities, Claimant informed Ms. Bell that he cared for his own hygiene and grooming, performed housework, washed dishes, did laundry, prepared simple meals, and watched television. (*Id.*) He also indicated that he cared for his mother. (*Id.*) He explained that a friend helped him with shopping, but he traveled to the post office. (*Id.*) He asserted that he previously enjoyed fishing, but had lost interest in that hobby.[5] (*Id.*) He stated that he was able to manage his own finances and balance a checkbook. (*Id.*) As for social functioning, Ms. Bell opined that Claimant interacted within normal limits. (*Id.*) In addition, she observed that Claimant visited with friends and family and that Claimant reported wanting to date. (*Id.*) Claimant also described attending his grandchildren's school functions and sporting events. (*Id.*) However, Ms. Bell did note that Claimant stated that he preferred to be alone. (*Id.*) In relation to Claimant's persistence and pace, Ms. Bell opined that both were within normal limits. (*Id.*) Ms. Bell asserted that Claimant's prognosis was poor, but that he would be able to manage his own benefits if they were awarded. (*Id.*)

### 2. Joseph A. Shaver, Ph.D., and John Todd, Ph.D.

On September 13, 2011, Joseph A. Shaver, Ph.D., completed a Psychiatric Review Technique. (Tr. at 496). Dr. Shaver noted that Claimant alleged suffering from depression and PTSD. (Tr. at 508). Dr. Shaver determined that Claimant suffered from cognitive disorder, not otherwise specified; depressive disorder, not otherwise specified; generalized anxiety disorder; and substance abuse addiction disorder; however, he

---

[5] At the administrative hearing, Claimant testified that he went fishing with one of his friends. (Tr. at 42-43).

found that these impairments were non-severe. (Tr. at 496-97, 499, 501, 504, 506). Dr. Shaver opined that Claimant had mild limitation in activities of daily living and maintaining social functioning, but no limitation in maintaining concentration, persistence, and pace. (*Id.*) Dr. Shaver also observed that Claimant had no episodes of decompensation of extended duration. (*Id.*) Dr. Shaver further opined that the paragraph C criteria for Listings 12.02, 12.04, and 12.06 were not met. (Tr. at 507). In the consultative notes section of the Psychiatric Review Technique form, Dr. Shaver summarized the results of Ms. Bell's evaluation of Claimant. (Tr. at 508). Dr. Shaver specifically noted Claimant's psychological testing scores, the results of Claimant's mental status examination, Ms. Bell's diagnoses of Claimant, and Claimant's activities of daily living as reported to Ms. Bell. (*Id.*) Dr. Shaver also summarized the activities of daily living contained in Claimant's July 2011 Adult Function Report. (*Id.*) In that report, Claimant asserted that he had a difficult time staying focused, he lacked the ability to concentrate, his mind raced, he experienced nightmares, he had no interest in attending to his personal care, and he felt hopeless and restless. (*Id.*) Claimant also stated that he preferred to be alone, stayed to himself, and had difficulty trusting other people. (*Id.*) He further indicated that he stayed inside, watched television, cared for his mother, prepared simple meals, and performed light housework. (*Id.*) In addition, Claimant wrote in that report that he did not care whether he lived or died. (*Id.*) Dr. Shaver opined that Claimant's reported problems with concentration were inconsistent with the results of Ms. Bell's evaluation. (*Id.*) He also concluded that Claimant's activities of daily living were not "significantly delayed." (*Id.*) Dr. Shaver emphasized the fact that Claimant reported no problems in getting along with others. (*Id.*) He noted that Ms. Bell observed that Claimant's concentration, attention, pace, persistence, and

26

memory were within normal limits. (*Id.*) Based on his review of the record, Dr. Shaver ultimately opined that Claimant possessed the mental capacity to engage in gainful work-like activity on a sustained basis. (*Id.*)

On January 17, 2012, John Todd, Ph.D., prepared a case analysis. (Tr. at 532). After reviewing the evidence in Claimant's file, Dr. Todd affirmed the Psychiatric Review Technique completed by Dr. Shaver. (*Id.*)

### 3. Mohammad K. Hasan, M.D.

On February 18, 2012, Dr. Hasan prepared a Medical Assessment of Ability to do Work-Related Activities (Mental). (Tr. at 545-47). Dr. Hasan was asked to rate Claimant's ability to perform work-related activities on a day-to-day basis using a scale that ranged from no ability to unlimited ability, with "poor," "fair," and "good" ability in between. (Tr. at 545). "Poor" ability meant that ability to function was "seriously limited but not precluded"; "fair" ability meant that ability to function was "limited but satisfactory"; and "good" ability meant that ability to function was "more than satisfactory." (*Id.*) Dr. Hasan opined that Claimant retained "fair" ability to follow work rules; relate to coworkers; use judgment; function independently; understand, remember, and carry out simple and detailed job instructions; maintain personal appearance; and relate predictably in social situations. (Tr. 545-46). However, Dr. Hasan determined that Claimant had "poor" ability in the areas of dealing with the public; interacting with supervisors; dealing with work stresses; maintaining attention/concentration; understanding, remembering, and carrying out complex job instructions; behaving in an emotionally stable manner; and demonstrating reliability. (*Id.*) He also found that Claimant could manage benefits in his own best interest. (Tr. at 547). Dr. Hasan left blank those sections of the form asking the physician to describe the

medical or clinical findings supporting the opined limitations. (Tr. at 546-47).

On September 11, 2013, after the ALJ's decision, Dr. Hasan wrote a letter to Claimant's counsel stating that he wished to clarify his opinions as to Claimant's limitations. (Tr. at 624). Dr. Hasan indicated that he had been seeing Claimant for medication management since 2007 due to Claimant's reported symptoms of depression and anxiety. (*Id.*) He noted that Claimant's "situational issues" were addressed by a social worker during individual therapy sessions. (*Id.*) In addition, Dr. Hasan explained that when he used the term "stable" in his treatment notes, he meant that Claimant's symptoms had neither worsened nor improved at those times. (*Id.*) On the subject of Claimant's limitations, Dr. Hasan stated that he had never formally evaluated Claimant for any disabling condition, but he believed that Claimant's emotional and physical issues would prevent him from maintaining any gainful employment. (*Id.*) Specifically, Dr. Hasan opined that Claimant was unable to work given the limitations in his abilities to interact with others, behave in an emotionally stable manner, deal with stressors, and demonstrate reliability. (*Id.*)

## VI.   <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.

1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.    Discussion

Claimant argues that the ALJ failed to assign appropriate weight to the opinions of Dr. Hasan. (ECF No. 13 at 18-21). Claimant contends that Dr. Hasan's opinions were entitled to controlling weight and that the ALJ neglected to explain why he afforded Dr. Hasan's opinions less than controlling weight. (*Id.* at 21). He insists that the ALJ failed to discuss the various factors used in assessing medical source opinions when weighing Dr. Hasan's opinions. (*Id.* at 19). To the extent that the ALJ supplied any reasons for his analysis of Dr. Hasan's opinions, Claimant avers that the ALJ did not cite specific record evidence validating his reasons and that those reasons were not supported by substantial evidence. (*Id.* at 21). In addition, Claimant asserts that, once the ALJ rejected both Dr. Hasan's opinions as to Claimant's mental limitations and the opinions

of the state agency medical consultants, the ALJ was left with no medical expert opinions from which he could determine Claimant's mental RFC. (*Id.* at 18).

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors[6] listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 20 C.F.R. § 416.927(c)(2)-

---

[6] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

(6), and must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

2. What an individual's RFC is;

3. Whether an individual's RFC prevents him or her from doing past relevant work;

4. How the vocational factors of age, education, and work experience

apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

As Claimant points out, the ALJ did not supply details in his written decision regarding how he applied the factors in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) to determine the weight given to Dr. Hasan's opinions. Instead, the ALJ summarized Claimant's treatment records with Dr. Hasan from 2007 through 2013, as well as Dr. Hasan's opinions contained in the medical assessment form, and he concluded that Dr. Hasan's opinions were entitled to "very little weight" because they were not supported by Dr. Hasan's own treatment notes. (Tr. at 18-20). Specifically, the ALJ stated that Claimant was frequently described by Dr. Hasan as stable with a euthymic mood. (Tr. at 20). In addition, the ALJ noted that Claimant sometimes reported feeling overwhelmed by caring for his mother, but that by the time of the administrative hearing, Claimant was receiving help with his mother's care. (*Id.*) Claimant insists that a more substantial analysis of Dr. Hasan's opinion was required by

the regulations. (ECF No. 13 at 19-20).

However, the Court does not find the absence of specifics regarding each factor to constitute error requiring a remand of the Commissioner's decision. Although 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). SSR 96-2p provides additional clarification of the ALJ's responsibility to give good reasons, stating:

> When the determination or decision: is not fully favorable, e.g., is a denial ... the notice of determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Cases discussing this duty take different approaches on what and how much the ALJ must include in the written opinion to constitute an adequate explanation. Some courts require the ALJ to "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Newbury v. Astrue,* 321 Fed. App'x 16, 17 (2d Cir. 2000) (quoting *Halloran v. Barnhart,* 362 F.3d 28, 33 (2d Cir. 2004)); *see also Sharfarz v. Bowen,* 825 F.2d 278, 279 (11th Cir. 1987). Other courts only insist on a detailed analysis of the weight given to a treating physician's opinion under the factors when there is an absence of "reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist." *Rollins v. Astrue,* 464 Fed. App'x. 353, 358 (5th Cir. 2012) (quoting *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000)).

Finally, some courts take the position that while the ALJ must consider the factors, he is not required to discuss each one in his opinion as long as a subsequent reviewer is able to understand the weight given to the opinions and the reasons for that weight. *Oldham v. Astrue,* 509 F.3d 1254, 1258 (10th Cir. 2007); *see also Green v. Astrue,* 588 F. Supp. 2d 147, 155 (D. Mass. 2008). This Court has held that "while the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014). "Simply stated, the adequacy of the written discussion is measured by its clarity to subsequent reviewers." *Young v. Colvin,* No. 3:13-cv-20719, 2014 WL 4546958, at *13 (S.D.W.Va. Sept. 12, 2014); *Tucker v. Astrue,* 897 F. Supp. 2d 448, 468 (S.D.W.Va. 2012); *see also Jividen v. Colvin,* No. 3:12-04698, 2014 WL 1333196, at *1, *21 (S.D.W.Va. Mar. 31, 2014) (adopting PF&R wherein magistrate judge recognized that ALJ need not explicitly mention each factor contained in 20 C.F.R. § 404.1527(c) when evaluating treating physician's opinion).

The ALJ began his RFC discussion by recognizing that certain rules and regulations control the weighing of medical opinion evidence, including 20 C.F.R. § 404.1527, 20 C.F.R. § 416.927, and "SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Tr. at 17). Next, the ALJ summarized Claimant's allegations at the administrative hearing. (*Id.*) The ALJ then utilized the two-step process for evaluating a claimant's allegations regarding his symptoms and found that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but not to the degree of severity that Claimant described. (Tr. at 17-18); *see also* 20 C.F.R. §§ 404.1529, 416.929.

After finding that Claimant's allegations were not entirely credible, the ALJ thoroughly summarized Claimant's treatment records, including medical records related to his treatment with Dr. Hasan from June 2007 through January 2013.[7] (Tr. at 18-19). The ALJ pointed out that Claimant reported symptoms of depression and anxiety on a number of occasions, but in July, October, and November 2007 his symptoms were well controlled or stable with treatment. (Tr. at 18). The ALJ acknowledged that Claimant received mental health treatment while incarcerated and indicated that he was adjusting well in May 2010. (*Id.*) The ALJ also recognized that Claimant was assigned a GAF score of forty-five to fifty in October 2011 after resuming treatment with Dr. Hasan, but that his symptoms were subsequently described as stable in December 2011. (Tr. at 19). The ALJ further noted that Claimant informed Dr. Hasan that he was eating and sleeping well on a number of occasions. (*Id.*) In addition, the ALJ observed that while Claimant had reported fleeting suicidal ideations to Mr. Johnson on June 6, 2012, when he visited Dr. Hasan five days later, Dr. Hasan opined that Claimant's symptoms were stable and remained stable from that point through at least November 16, 2012. (*Id.*) The ALJ acknowledged that Claimant attended two subsequent appointments with Dr. Hasan where he reported some increased symptoms. (*Id.*)

The ALJ then turned to Ms. Bell's evaluation of Claimant. (*Id.*) He summarized the symptoms and activities of daily living reported by Claimant to Ms. Bell. (*Id.*) The ALJ listed Claimant's activities of daily living as including taking care of his own personal needs, caring for his mother, completing the housework, washing dishes, doing laundry, and preparing simple meals. (*Id.*) In addition, the ALJ discussed Claimant's

---

[7] The last treatment record summarized by the ALJ pertained to a purported February 17, 2013 visit. (Tr. at 19). While the treatment record referred to by the ALJ appears to have been created on February 17, 2013, the date of service listed on the record is January 14, 2013. (Tr. at 617).

psychological test scores and Ms. Bell's diagnoses. (*Id.*)

The ALJ then addressed what he considered to be inconsistencies between the objective evidence and Claimant's allegations. (Tr. at 19-20). The ALJ observed that Claimant alleged significant mental health limitations, yet his activities of daily living were not limited to the extent one would expect given the severity of the claims. (Tr. at 20). The ALJ emphasized that Claimant was able to care for his mother who suffered from Alzheimer's disease. (Tr. at 19-20). Additionally, the ALJ stressed that Claimant worked for more than two decades as a teacher and a coach, and he only stopped working because he was charged with and ultimately convicted of a drug-trafficking crime. (Tr. at 19). The ALJ also found it significant that Claimant's symptoms were effectively controlled with generally routine care and medications. (Tr. at 20). Given these contradictions in the evidence, the ALJ concluded that Claimants statements regarding the persistence, severity, and disabling effects of his symptoms were not corroborated by the other evidence in the record. (Tr. at 19-20).

After discussing Claimant's treatment records and self-reported activities, the ALJ turned to the opinion evidence in the record. He noted that both Dr. Shaver and Dr. Todd had opined that Claimant's mental limitations were non-severe. (Tr. at 20). The ALJ assigned no weight to their opinions because he determined that the record supported a finding that Claimant experienced severe mental health impairments. (*Id.*)

Finally, the ALJ examined Dr. Hasan's opinions contained in the medical assessment form. (*Id.*) As discussed above, the ALJ found that Dr. Hasan's opinion regarding Claimant's "poor" abilities in a number of functional areas were entitled to "very little weight." (*Id.*) The ALJ concluded that Dr. Hasan's opinions were not supported by his own treatment records. (*Id.*) Particularly, the ALJ noted that Claimant

was "frequently described as stable and he occasionally presented with euthymic mood" at the office visits. (*Id.*) Moreover, any exacerbation of Claimant's symptoms brought on by the stress of caring for his mother was likely reduced by the time of the administrative hearing as he testified that he was receiving help with his mother's care. (*Id.*) Although the ALJ did not reiterate every office record that informed his determination, the written decision is sufficiently clear that when the ALJ found Dr. Hasan's opinions to be without support from "the psychiatrist's own treatment records," the ALJ was referring to the office notes he had just discussed in detail. (Tr. at 18-20).

Furthermore, while the ALJ did not explicitly go through each of the factors used to weigh medical source opinions, he plainly considered them.  The ALJ explicitly conceded that Dr. Hasan was Claimant's treating psychiatrist since 2007, and that Claimant had visited him regularly. (Tr. at 18-20). The ALJ also examined the consistency and supportability of Dr. Hasan's opinions as demonstrated by his review of Dr. Hasan's treatment records, Claimant's treatment records from the period of time that he was incarcerated, Ms. Bell's evaluation report, and the discussion of inconsistencies between various pieces of evidence. (Tr. at 18-19). In the end, the ALJ determined that Dr. Hasan's opinions as to Claimant's mental limitations were unsupported by the medical evidence and inconsistent with his own treatment records. (Tr. at 20). Applying the sufficient clarity standard described above, the Court **FINDS** that the ALJ adequately explained his reasons for assigning "very little weight" to Dr. Hasan's opinions. Ultimately, the RFC assessment was based upon a thorough review, analysis, and weighing of the medical information, opinions, and other evidence in the record.

The Court also **FINDS** that the ALJ's rejection of Dr. Hasan's opinions as to the

severity of Claimant's mental limitations is supported by substantial evidence. The ALJ correctly found that Dr. Hasan's treatment records did not support his opinions. As the ALJ underscored, at a number of appointments from July 2007 through November 2007, Dr. Hasan recorded that Claimant's symptoms were stable and controlled by medication. (Tr. at 18). During that time period, Dr. Hasan often described Claimant's condition as "fair." Claimant agreed that he was doing fairly well, was stable on medication, and he denied any worsening of his symptoms despite the fact that he was facing a substantial prison sentence for drug trafficking. (Tr. at 534-38). Indeed, considering the trouble in which Claimant found himself, after decades of leading what appeared to be a crime-free and commendable life, Claimant's psychological state was surprisingly stable. Dr. Hasan observed that Claimant's affect was euthymic during that same period. (Tr. at 20, 534-38). As a result of Claimant's steady condition throughout 2007, Dr. Hasan made few changes to the medications and dosages that he prescribed to treat Claimant's symptoms of anxiety and depression. (Tr. at 534-38).

After being released from prison, Claimant resumed treatment with Dr. Hasan in October 2011. (Tr. at 542). While Dr. Hasan described Claimant's affect as somewhat dysphoric and assigned a GAF score of forty-five to fifty at that appointment, which indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning," he also noted that Claimant was cooperative and oriented with intact cognition and normal thought processes. (Tr. at 542-43). Additonally, Dr. Hasan indicated that Claimant denied suicidal ideations or plans and that his insight, judgment, and problem solving were fair. (Tr. at 542). Dr. Hasan also recorded that Claimant attended the appointment with a friend, and Claimant stated that medications helped his symptoms. (*Id.*) At subsequent appointments with Ms. Mooney and Dr.

38

Hasan from December 2011 through April 2012, Claimant's symptoms were described as stable and his mood was found to be euthymic. (Tr. at 544, 567-68). Claimant denied suicidal ideations at each appointment. (*Id.*) His psychotropic medications remained largely the same throughout that period, and he did not require hospitalization. (*Id.*) As the ALJ noted, Claimant also reported eating and sleeping well during that time frame, and Claimant's diagnosis changed from major depressive disorder, recurrent, moderate/moderately severe to major depressive disorder, recurrent, partial remission. (Tr. at 19, 542, 544, 567-68). While Claimant reported to a social worker on June 6, 2012 that he experienced fleeting suicidal ideation, five days later, he informed Dr. Hasan that he was not experiencing any suicidal ideation or intent, and Dr. Hasan described Claimant's mood as euthymic and symptoms as stable. (Tr. at 569-70). At the June 6 appointment, Claimant implied that taking care of his mother contributed to the worsening of his symptoms; however, as the ALJ noted, by the time of the administrative hearing, Claimant was receiving some help with her care. (Tr. at 20, 569). The ALJ indicated that Dr. Hasan found Claimant's symptoms to be stable at his November 2012 appointment. (Tr. at 19, 573). At that appointment, Dr. Hasan observed that Claimant's mood was euthymic and his insight and judgment were good. (Tr. at 573). Claimant also informed Dr. Hasan that he was sleeping and eating well and that he was not experiencing suicidal ideations. (*Id.*) The ALJ acknowledged that at Claimant's January 23, 2013 appointment with Dr. Hasan, Claimant's mood was anxious and his affect was restricted; however, Claimant stated that he had not been taking Valium because he had lost his written prescription. (Tr. at 19, 574). Furthermore, Claimant denied any suicidal ideations and reported that he was sleeping and eating well. (Tr. at 574). Dr. Hasan noted that Claimant was cooperative, his thoughts were logical, his

memory was intact, and his insight and judgment were good. (*Id.*) Claimant's prescription medications remained unchanged by Dr. Hasan at that appointment. (*Id.*)

In sum, Dr. Hasan's longitudinal treatment records support the ALJ's conclusion that Claimant's mental health symptoms were stable on medication. (Tr. at 18-20). As noted above, the ALJ also correctly found that the treatment records did not support the severity of symptoms described by Dr. Hasan in his medical assessment. (Tr. at 20). Claimant consistently reported to Dr. Hasan that his symptoms had not worsened, and Dr. Hasan repeatedly observed that Claimant was stable with a euthymic mood. (*Id.*) Any periods of symptom exacerbation reported by Claimant were short-lived and were either situational or related to Claimant's lack of medication. Thus, Dr. Hasan's opinions lack apparent support from his own treatment records. Not surprisingly, he failed to cite to any medical or clinical findings underlying the opinions he supplied on the medical assessment form. (Tr. at 546-47).

Substantial evidence likewise supports the ALJ's conclusion that Claimant's work history and activities of daily living contravened a determination that he was unable to engage in gainful activity. (Tr. at 19-20). As for Claimant's activities of daily living, the ALJ emphasized throughout his decision that Claimant was able to care for his mother, who suffered from Alzheimer's disease. (Tr. at 19-20). The ALJ properly observed that caring for a person who suffers from such a disease would require both concentration and adequate cognitive functioning. (Tr. at 20). Claimant reported that he was capable of preparing meals, performing household chores, completing personal care activities, going shopping, going out for drinks with his sons, visiting his family on holidays or when his children and grandchildren came to see him, watching television, paying bills, and handling bank accounts. (Tr. at 15-16). These activities are inconsistent with the

severity of limitations found in Dr. Hasan's medical assessment form. For example, while Dr. Hasan opined that Claimant had "poor" ability to demonstrate reliability, he was reliable enough to care for his mother. Likewise, Claimant obviously is not as socially limited by his mental health condition as Dr. Hasan opined given that Claimant goes out for drinks with his sons, visits his family, takes care of his mother, and told Ms. Bell that he would like to resume dating.

As for Dr. Hasan's September 2013 letter, which was made a part of the administrative record by the Appeals Council, it adds little value or additional clarity to his opinions.[8] (Tr. at 5, 624). While Dr. Hasan stated that his use of the term "stable" meant that Claimant's symptoms "neither worsened nor improved," during periods of treatment, that almost certainly was the ALJ's understanding of the term "stable" when reviewing Dr. Hasan's treatment notes, as that is the common understanding of "stable" in the medical context. *See, e.g.*, *St. Anthony Hosp. v. United States Dep't of Health & Human Servs.*, 309 F.3d 680, 694 (10th Cir. 2002) (noting that medical term "stable condition" means that "'patient's disease process has not changed precipitously or significantly.'") (quoting *Tabor's Cyclopedic Medical Dictionary* 1861 (Clayton L. Thomas ed., 17th ed. 1993)). Moreover, Dr. Hasan's purported clarification of the term "stable" does not alter the fact that he regularly recorded no subjective or objective

---

[8] When the Appeals Council incorporates new and material evidence into the administrative record, and nevertheless denies review of the ALJ's findings and conclusions, the issue before the Court is whether the Commissioner's decision is supported by substantial evidence in light of "the record as a whole including any new evidence that the Appeals Council specifically incorporated into the administrative record." *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (remanding for rehearing pursuant to sentence four of 42 U.S.C. § 405(g)) (quoting *Wilkins v. Sec., Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991)) (internal markings omitted); *see also Snider v. Colvin* No. 6:12-cv-00954, 2013 WL 4880158, at *5 (S.D.W.Va. Sept. 12, 2013) ("[W]here a claimant has submitted additional evidence to the Appeals Council, and the Appeals Council considered that evidence and made it part of the record, this Court must review the record as a whole, including the new evidence, to determine whether substantial evidence supports the Commissioner's findings."). In this case, Claimant has not requested remand based specifically on Dr. Hasan's September 2013 letter.

findings indicating that Claimant's mental health symptoms were as serious as he opined in the medical assessment form. Dr. Hasan certainly did not feel that Claimant's symptoms were sufficiently severe to require a higher level of care—such as, inpatient treatment or even residential therapy—or he undoubtedly would have ordered it. Dr. Hasan admits in the letter that he never evaluated Claimant from the standpoint of gauging disability, and much like his prior opinion, Dr. Hasan failed to describe any medical or clinical findings in his September letter that substantiated the opinions contained in the either the letter or the medical assessment form. Additionally, Dr. Hasan determined that Claimant's major depressive disorder was in partial remission by April 2012, and there were rarely significant adjustments made to Claimant's prescription medications throughout Dr. Hasan's treatment.

Notably, the opinions contained in the letter are identical to those included in the medical assessment form considered by the ALJ, with the exception of Dr. Hasan's additional opinion that "the emotional and physical issues [Claimant] is dealing with would affect him in [his abilities to interact with others, behave in an emotionally stable manner, deal with stressors and demonstrate reliability] and I do feel that he is presently unable to maintain gainful employment." (Tr. at 624). As stated above, Dr. Hasan does not elaborate further on this opinion, or declare with specificity how long Claimant will be "unable to maintain gainful employment." Nevertheless, even if he had provided a solid foundation for his opinion, it is still not entitled to controlling weight or special significance. As this latest opinion answers the ultimate question of disability, it is an opinion on an issue reserved to the Commissioner. Such opinions are never entitled to controlling weight. 1996 WL 374183, at *2.

Finally, Claimant's argument that the ALJ's RFC assessment must be supported

by the opinion of a medical expert is unavailing.[9] The United States Court of Appeals for the Fourth Circuit and this Court have recognized that the RFC assessment is an administrative finding rather than a medical finding.[10] *Felton-Miller v. Astrue*, 459 F. App'x 226, 230-21 (4th Cir. 2011) (stating that RFC "is an administrative assessment made by the Commissioner based on all the relevant evidence in the case record.") (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)); *Youkers v. Colvin*, No. 3:12-9651, 2014 WL 906484, at *10 (S.D.W.Va. Mar. 7, 2014). Accordingly, an ALJ is **not** required to obtain an expert medical opinion as to a claimant's RFC. *Felton-Miller*, 459 F. App'x at 230-31; *Hucks v. Colvin*, No. 2:12-cv-76, 2013 WL 1810658, at *9 (N.D.W.Va. Apr. 3, 2013), report and recommendation adopted by 2013 WL 1810656 (N.D.W.Va. Apr. 29, 2013); *see also Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) ("[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."); *Sullivan v. Comm'r of Soc. Sec.*, No. 2:13-cv-1460-KJN, 2014 WL 6685075, at *4 (E.D. Cal. Nov. 25, 2014) ("It is the ALJ's responsibility to formulate an RFC that is based on the record as a whole, and thus the RFC need not exactly match the opinion or findings of any particular medical source."); *Mitchell v. Comm'r of Soc. Sec.*, No. SAG-12-3332, 2013 WL 5182801, at *1 (D. Md. Sept. 12, 2013) ("An ALJ need not parrot a single medical opinion, or even assign 'great weight' to any opinions, in determining an RFC."); *Thomas v. Colvin*, No. 12-227-N, 2013 WL 1218920, at *8 (S.D. Ala. Mar. 25, 2013)

---

[9] As discussed above, the ALJ summarized a portion of Ms. Bell's findings, but did not cite the findings in Ms. Bell's report that supported his RFC determination. Ms. Bell determined that Claimant's concentration, memory, persistence, pace, and social functioning were all within normal limits. (Tr. at 490, 492). She observed that Claimant's attitude and behavior were socially appropriate. (Tr. at 489). She further indicated that Claimant's thought processes were goal-directed and relevant, and his thought content and judgment were normal. (*Id.*)

[10] In contrast, the United States Court of Appeals for the Eighth Circuit has held that the RFC assessment is a medical question. *See, e.g., Martise v. Colvin*, 641 F.3d 909, 923 (8th Cir. 2011).

(recognizing that RFC determination need not be supported by specific medical opinion); *Town v. Astrue*, No 3:12cv105, 2012 WL 6150836, at *4 (N.D. Ind. Dec. 10, 2012) ("The determination of an individual's RFC need not be based on a medical opinion because it is a determination reserved to the ALJ as fact-finder for the Commissioner."). Instead, an ALJ must *consider* all relevant evidence in the record, including the opinions of medical sources, and arrive at a determination of a claimant's RFC that is supported by substantial evidence. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); SSR 96-8p, 1996 WL 374184, at *5. In doing so, an ALJ possesses the discretion to reject medical opinion evidence unsupported by the record. *Johnson*, 434 F.3d at 654 n.5, 657 (recognizing that ALJ is free to reject medical source opinions where substantial evidence does not support those opinions, or in the case of a treating source, where there is persuasive contrary record evidence). However, if an ALJ formulates an RFC finding that conflicts with medical source opinion evidence, then the ALJ is required to explain his reasons for rejecting that evidence. SSR 96-8p, 1996 WL 374184, at *7.

In this case, the ALJ assigned no weight to the opinions of Dr. Shaver and Dr. Todd, which benefitted Claimant, and assigned "very little weight" to the opinions of Dr. Hasan. (Tr. at 20). The ALJ seemingly adopted Dr. Hasan's opinion that Claimant was limited in his ability to deal with the public and his ability to understand and carry out complex tasks by including limitations in those areas in the RFC finding. (Tr. at 17, 545-46). With those exceptions, the ALJ apparently rejected the remainder of Dr. Hasan's RFC opinions as to Claimant's mental limitations. In accordance with SSR 96-8p, the ALJ explained his reasons for rejecting the medical opinions that conflicted with his RFC finding. (Tr. at 20). The ALJ also summarized Claimant's mental health treatment

records, which were not difficult for a lay person to understand, along with Claimant's activities of daily living and work history. It is clear from the ALJ's written decision that he considered all of the relevant record evidence in determining Claimant's RFC, and as noted above, the ALJ was not required to obtain an expert medical opinion on the subject. *Felton-Miller*, 459 F. App'x at 230-31. Furthermore, having reviewed the mental health treatment records and other documentary evidence that the ALJ relied on in his RFC discussion, the Court **FINDS** that the ALJ's RFC finding is supported by substantial evidence. *See McDonald v. Astrue*, 492 F. App'x 875, 885-86 (10th Cir. 2012) (finding ALJ could properly determine extent of mental limitations after rejecting all medical opinion evidence based on claimant's medical records, daily activities, and response to medications).

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to counsel of record.

**ENTERED**: March 9, 2015

Cheryl A. Eifert
United States Magistrate Judge

45